# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **S.K., by his next friend DYANN KING,** | |
| **Plaintiff,** | **No. 14 C 5868** |
| **v.** | **Magistrate Judge Mary M. Rowland** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Dyann King, maternal aunt and legal guardian of S.K., filed this action seeking reversal of the final decision of the Commissioner of Social Security ending S.K.'s Supplemental Security Income under § 1614(a)(3)(C) of the Social Security Act (Act). 42 U.S.C. § 1382c(a)(3)(C). The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and S.K. has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Supplemental Security Income (SSI), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155

F.Supp.2d 973, 976-77 (N.D. Ill. 2001).[1] A child qualifies as disabled and therefore may be eligible for SSI if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and the impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). "There is a statutory requirement that, if you are eligible for disability benefits as a disabled child, your continued eligibility for such benefits must be reviewed periodically." 20 C.F.R. § 416.994a(a).

To determine if a claimant under the age of 18 continues to be disabled, the Social Security Administration (SSA) follows a three-step evaluation process. 20 C.F.R. § 416.994a(b). First, the ALJ considers whether there has been medical improvement since the most recent favorable determination that the claimant was disabled. *Id.* § 416.994a(b)(1). If there is no improvement, the claimant remains disabled.[2] *Id.* If there has been improvement, the ALJ proceeds to the next step and considers whether the impairment the child had at the time of the most recent favorable decision continues to meet or equal the severity of the listing it met or equaled at that time. *Id.* § 416.994a(b)(2). If the impairment does meet or equal the

---

[1] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both SSI and DIB cases.

[2] There are certain exceptions where a child's disability can be found to have ended even though no medical improvement has occurred. 20 C.F.R. § 416.994a(e)–(f). None of the exceptions apply in this case.

severity of the same listing section used to make the most recent favorable decision, the claimant remains disabled. *Id*. If the impairment does not still meet or equal the listed impairment, the ALJ proceeds to the third step. *Id*. At step three, the ALJ determines whether the child has any other severe impairment that meets, medically equals, or functionally equals a listing. *Id*.

If the claimant's current impairment(s) meets or medically equals the severity of any listed impairment, the claimant's disability continues. 20 C.F.R. § 416.994a(b)(3)(ii). If not, the ALJ determines whether the claimant's impairment(s) functionally equal the listings. *Id*. § 416.994a(b)(3)(iii). If the claimant's current impairment(s) functionally equal the listings, the claimant's disability continues. *Id*. If the claimant's current impairment(s) do not functionally equal a listing, the claimant's disability has ended. *Id*.

To functionally equal the listings, the ALJ must find an "extreme" limitation in one domain or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *Id*. § 416.926a(b)(1)(i)–(vi). A "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(2)(i). An "extreme" limitation exists when a child's "impairment(s) interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(3)(i).

## II. PROCEDURAL HISTORY

The SSA originally approved S.K. for SSI benefits on September 29, 2006, due to premature birth (35 2/7 week gestational age with birth weight of 1810 grams (4 pounds) and length 16.5 inches) with maternal heroin and cocaine use. (R. at 437–42). Approximately three years later, the SSA reviewed S.K.'s disability status. The SSA determined that S.K.'s condition had improved and his condition was no longer disabling at the initial and reconsideration levels. (*Id.* at 168-69, 171, 172–76, 181–84, 330–45, 347–52, 475–86). On August 9, 2011, S.K. and Ms. King, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 53–67, 67–106). The ALJ also heard testimony from Milford Schwartz, M.D., a medical expert (ME). (*Id.* at 106–61, 240).

On August 7, 2013, the ALJ found that S.K.'s disability ended as of January 1, 2010. (R. at 13–28). Applying the three-step sequential evaluation process, the ALJ found, at step one, that medical improvement occurred as of January 1, 2010, because S.K. no longer suffers from premature birth and there is no indication of any growth impairment. (*Id.* at 17). At step two, the ALJ found that since January 1, 2010, the impairments that S.K. had at the time of the most recent favorable decision dated September 29, 2006 (premature birth with maternal heroin and cocaine use) have not functionally equaled the Listing of Impairments. (*Id.*). At step three, the ALJ determined that since January 1, 2010, S.K. has had the severe impairments of static encephalopathy and attention deficit hyperactivity disorder (ADHD) diagnosed as of March 2011 but has not had an impairment or combination of im-

pairments that meets, medically equals, or functionally equals one of the listed impairments. (*Id.* at 18, 23–28). The ALJ concluded that S.K. did not meet or medically equal either Listing 112.02 for organic brain disorder or Listing 112.11 for ADHD, finding less than marked limitations in all of the "B" criteria (cognitive/communicative functioning, social functioning, personal functioning, and concentration, persistence, or pace). (*Id.* at 23–24).

In determining that S.K. does not have an impairment which functionally equaled a listing, the ALJ found that since January 1, 2010, S.K. has had a less than marked limitation in acquiring and using information, attending and completing tasks, caring for himself, and in health and physical well-being. (R. at 26–27). In the domain of interacting and relating to others, the ALJ found that since January 1, 2010, S.K. has had a marked limitation. (*Id.* at 26). The ALJ found that since January 1, 2010, S.K. has had no limitation in the domain of moving about and manipulating objects. (*Id.* at 27). With neither marked limitations in two domains nor an extreme limitation in one domain, the ALJ concluded that S.K.'s disability ended as of January 1, 2010, and S.K. has not become disabled again since that date. (*Id.* at 28).

The Appeals Council denied S.K.'s request for review on May 29, 2014. (R. at 1–7). S.K. now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the S.K. is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

S.K. was born on May 13, 2006, and has a history of premature birth, asthma, and ADHD. (R. at 53). On October 15, 2009, when S.K. was three years and five months old, Harvey I. Friedson, Psy.D., conducted a psychological evaluation. (*Id*. at 456–58). Dr. Friedson administered a Wechsler Preschool and Primary Scale of Intelligence test which resulted in a verbal IQ of 74, a performance IQ of 73, a full scale IQ of 70, and a global language score of 68. (*Id*. at 456). Dr. Friedson concluded that S.K.'s scores indicated mild to borderline range of delays. (*Id*. at 458). Dr. Friedson found that S.K. "does present as well-related. In this one-to-one setting, he remains in his chair. He did have some difficulty with transitions. In the waiting room, he also appeared active. Nevertheless, in this setting, he never required limit-setting." (*Id*.).

David W. Miller, M.D., performed a pediatric consultative examination on October 15, 2009. (R. at 461–65). Dr. Miller observed that S.K. was "an alert, extremely active little boy with limited speech who did appear to enjoy interacting with the

evaluator." (*Id.* at 463). S.K. was able to "copy a line but not a circle or a cross." (*Id.* at 462). Dr. Miller noted a concern about S.K.'s development: "The child had a history of developmental delays. He is not receiving any therapies at the present time. His speech is particularly noticeable as a developmental issue." (*Id.* at 464). Ms. King reported that S.K. was unusually hyperactive. (*Id.*). Dr. Miller concluded: "During the examination today, the child was extremely active, but it would be difficult to say whether or not he was beyond the realm of normal for his age group." (*Id.*).

On December 7, 2009, Melanie Boyd, M.S., CCC-SLP, performed a speech and language consultative examination. (R. at 471–74). Ms. King reported that while S.K. has no medical conditions, she is concerned about S.K.'s hyperactive behavior. (*Id.* at 472). Due to S.K.'s short attention span and young age, the Preschool Language Scale-4 was used to assess S.K.'s articulation skills. (*Id.*). S.K.'s conversational speech was 75% intelligible with unfamiliar listeners when context was known and 50% intelligible or less when context was unknown. (*Id.*). On the auditory comprehension portion of the test, S.K. earned a standard score of 71, a percentile rank of 3, and an age equivalent of 2 years and 4 months. (*Id.* at 473). S.K. "was unable to identify colors, make inferences or identify categories of objects in pictures." (*Id.*). S.K. achieved a standard score of 80, a percentile rank of 9, and an age equivalent of 2 years and 8 months on the expressive communication portion. (*Id.*). S.K. achieved a total standard score of 73, a total percentile rank of 4, and a total age equivalent of 2 years, 6 months. (*Id.*). Boyd concluded that S.K. demonstrated moderate delays

in receptive language skills and mild deficits in expressive language skills. (*Id*.). She opined that S.K.'s oral motor skills seemed adequate for the production of speech, his parameters of voice were within functional limits, and his speech was fluent. (*Id*. at 474).

In December 2009, three state agency consultants (Deborah Alrbight, M.D., Donna Hudspeth, Psy.D, and Michelle Curran, SLP) reviewed S.K.'s records and completed the Childhood Disability Evaluation Form. (R. at 475–80). They found that S.K. had severe impairments of speech delay, developmental delay, and learning disorder but found that S.K. did not meet, medically equal, or functionally equal a listing because he had less than marked limitations in the second, third, and sixth domains (*i.e.* attending and completing tasks, interacting and relating with others, and health and physical well-being) and no limitations in the fourth and fifth domains (*i.e.* moving and manipulating objects and caring for yourself). (*Id*. at 475, 477–78). The state agency consultants found that S.K. was markedly limited in the first domain of acquiring and using information. (*Id*. at 477).

A second pediatric consultative examination was conducted by Daksha A. Patel, M.D., on March 8, 2010. (R. at 489–92). Ms. King reported that S.K. was able to feed himself, undress himself, and brush his teeth with help. (*Id*. at 490). Dr. Patel found that S.K. was alert, active, and cooperative, did not know colors, was able to draw a circle, and was able to indicate his needs. (*Id*. at 490–91).

On March 9, 2011, S.K.'s teachers at his YMCA preschool detailed their developmental concerns regarding S.K. (R. at 500). They reported that S.K. cries

throughout the day and "has difficulty staying on task, following the routine of the day, listening to the teachers, [and] following directions." (*Id.*). The teachers reiterated Ms. King's concerns about S.K. "not listening, following directions, being extremely active, [and] crying." (*Id.*). The YMCA referred S.K. to St. Mary's Hospital for Children for a psychological evaluation and recommended that Ms. King follow up with a mental health professional. (*Id.*). On March 29, 2011, Irma E. Maravilla, M.D., S.K.'s pediatrician, diagnosed ADHD with a history of behavior and hyperactivity problems. (*Id.* at 517).

In June 2011, Linda Schmidt, S.K.'s preschool teacher, who had known him for two years, completed a Teacher Questionnaire regarding S.K.'s functioning in each of the six childhood functional domains. (R. at 93, 524–30). In the second domain of attending and completing tasks, Schmidt reported obvious or greater problems in 8 of 13 activities. (*Id.* at 526). She explained that "[S.K.'s] attention span is short. He has difficulty in a large group setting especially when a teacher is discussing a subject or study. [S.K.] becomes easily distracted and will act inappropriately causing great disruption among the classroom environment." (*Id.*). In the third domain of interacting and relating with others, Schmidt opined obvious or greater problems in 12 of the 13 activities, including very serious problem (the most severe rating) in seeking attention appropriately, expressing anger appropriately, and respecting/obeying adults and serious problems in playing cooperatively with other children, making and keeping friends, using language appropriate to the situation and listening, and taking turns in a conversation. (*Id.* at 527). She concluded that "[S.K.]

does not have difficulty playing and working independently. It is when he interacts with other children in the classroom that [S.K.'s] behavior becomes inappropriate. He has difficulty playing cooperatively in a group of three or more children." (*Id.*).

In the fifth domain of caring for himself, Schmidt assessed a very serious problem (the most severe rating) in five of the nine activities, including handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, responding appropriately to changes in own mood (e.g. calming self), and using appropriate coping skills to meet daily demands of school environment. (R. at 529). She explained:

> S.K. displays a short temper with poor judgment. When [S.K.] becomes angry he will scream, cry, and kick anyone (student or adult) who is in his reach. He has difficulty calming himself and interaction with others is impossible during this period of time. [S.K.] when angry becomes unsafe for himself and those around him. He will throw objects, kick and punch the person that is closest to him.

(*Id.*). Ms. Schmidt had no opinion regarding S.K.'s abilities in the first domain of acquiring and using information and found no problems in the fourth domain of moving about and manipulating objects. (*Id.* at 525, 528).

S.K. was five years old at the time of the hearing before the ALJ on August 9, 2011. (R. at 53). Ms. King related that S.K.'s mother was using cocaine and heroin at the time of his birth. (*Id.* at 68–69). Ms. King indicated that she has been S.K.'s caregiver since birth. (*Id.* at 60). At the time of the hearing, S.K. was in an all-day preschool/day care class for children with learning disabilities and behavioral issues. (*Id.* at 69–70). Ms. King testified:

Q. And when he entered the kindergarten, was there any kind of testing or anything? Did they place him in a certain kind of kindergarten or does everyone just based on their age go to this one?

A. No, [S.K.] was tested.

Q. Okay. And so is this a—is this like a pre-kindergarten for children with say lower IQs or behavioral issues or is this just—do kids whether they have any issues or not go to this kindergarten is what I'm trying to find out?

A. Yes, they do, but it's separate rooms.

Q. Okay. So he's, he's in a separate room?

A. Yes.

Q. Okay. Any why, why is he in a separate room? Why, why, why did they put him in a separate room?

A. Because they had to come out to the house and they had to evaluate him, like blocks.

Q. Okay. You mean the school evaluated him?

A. Yes, for—

Q. Okay.

A. —so they could be able to place him in the room with the other kids.

\*     \*     \*

Q. And did they tell you what was—what type of a separate room it was, why he was placed in this particular separate room?

A. Yes.

Q. What was that? Why did they tell you?

A. Learning disabilities and his behavior.

Q. And behavior. And what did they say about his behavior?

A. Short tempered, fight, throwing chairs.

Q. Okay. Has he ever with any of that in the two years that he's—is he still in the same type of special room?

A. Yeah, he's still in the same room.

(*Id.* at 70–71).

Ms. King frequently gets calls from the preschool reporting that S.K. is short tempered, fights with other children, throws chairs, and will not listen. (R. at 71–

72). S.K. went for a psychological evaluation in 2009, and it was recommended that S.K. have regular counseling. (*Id*. at 74). Ms. King did not schedule regular counseling for S.K. because of her job schedule and because she thought that she could teach S.K. herself. (*Id*. at 74, 77–78). S.K.'s pediatrician diagnosed ADHD and prescribed medication to calm him down. (*Id*. at 75–77, 81–82, 95–104).

Ms. King explained that she has to give S.K. her full attention and never lets him be alone. (R. at 78, 92). S.K. can sit still for only a short period of time. (*Id*. at 87, 89). Ms. King described one instance when they were watching TV and S.K. "just jumped out of nowhere and ran his head into the china cabinet." (*Id*. at 78). On other occasions, S.K. has tried to stick his fingers in electrical outlets and climb on top of the refrigerator. (*Id*. at 92). Ms. King needs to hold S.K.'s hand outside or he will "just bust[] out and start running" and "run in the street." (*Id*. at 78). Ms. King helps S.K. with brushing his teeth, washing his face, bathing, and dressing. (*Id*. at 84–85).

At the hearing, Dr. Schwartz reviewed the record, observed S.K., and offered testimony as an ME. (R. at 106–61). He opined that S.K. has static encephalopathy, an organic brain dysfunction, based on his intrauterine drug exposure and "clearly fulfills the DSM criteria for ADHD." (*Id*. at 134–35). Dr. Schwartz testified that "an injury to the fetal brain . . . which persists and which manifests itself typically if a child ends up in a good home . . . which this child has, you end up having less problems with acquiring and using. But as you get older, typically it is a significant

problem[] with attention and sleeping [and] impulse control, all the things that were described. We saw a lot of that here." (*Id.* at 135). Dr. Schwartz continued:

> [T]here's clear evidence of a continuation of problems that were started before he was born . . . from his drug exposure. And there's no—there's just no question about it . . . he's got documented problems with, he does have a history of delay. He does have documentation of, of impulse control and he does have problems with attention, all of which are evident. I give the teacher's report and also with his mother's testimony extreme credibility because I see it also.

(*Id.* at 136–38). Dr. Schwartz opined that S.K. has: (1) less than marked limitations in the domain of acquiring and learning; (2) less than marked limitations in the domain of attending to and completing tasks; (3) marked limitations in the domain of interacting and relating with others; (4) no limitations in the domain of moving about and manipulating objects; (5) marked limitations in the domain of caring for oneself; and (6) less than marked limitations in the domain of health and well-being. (*Id.* at 151, 153-55). He had no opinion about whether S.K. meets or medically equals a listing. (*Id.* at 140).

On August 30, 2011, Donna Vasquez, M.D., reported that S.K. was a patient at Chicago Hamlin Medical Center. (R. 359). While S.K. was recently referred to a specialist for ADHD treatment Dr. Vasquez had not prescribed any medications to treat his ADHD. (*Id.*).

## V. DISCUSSION

S.K. raises two main arguments in support of his request for reversal of the ALJ's determination that he is not disabled: (1) the ALJ erred in finding that S.K's impairments do not meet or medically equal Listing 112.02 for Organic Mental Dis-

orders, and (2) substantial evidence does not support the ALJ's findings that S.K. has less than marked limitations in the functional domains of caring for oneself, attending and completing tasks, and acquiring and using information. Because the ALJ clearly committed the second error, the Court addresses it first and need not address his alternative argument.

## A. Self-Care

The self-care domain involves how well the child maintains a healthy emotional and physical state. 20 C.F.R. § 416.926a(k). This includes how well he gets his physical and emotional wants and needs met in appropriate ways; how well he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. *Id.* The ALJ found that S.K. has less than a marked limitation in the domain of caring for himself and provided five reasons for her finding: (1) S.K.'s ability to feed himself, undress himself, and brush his teeth with help; (2) non-receipt of special education services; (3) lack of suspensions from preschool; (4) his ability to play independently; and (5) good behavior during the consultative examinations. (R. at 27). S.K. argues that the ALJ erred in failing to acknowledge Dr. Schwartz's opinion that he is markedly limited in the self-care domain. S.K. also contends that the ALJ erred by failing to address S.K.'s emotional state in her discussion of the self-care domain and improperly relied on his non-receipt of special education services and good behavior at consultative exams in finding that he has had less than a marked limitation in the ability to care for himself.

The ALJ's finding that S.K. has less than a marked limitation in the self-care domain is not supported by substantial evidence. Specifically, the ALJ failed to acknowledge that Dr. Schwartz testified that S.K. was "clearly marked" in the self-care domain based on his preschool teacher's questionnaire and Ms. King's testimony. (R. at 149–51). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Indoranto*, 374 F.3d at 474 ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.").

The Commissioner argues that the ALJ's failure to mention Dr. Schwartz's opinion was harmless. The Commissioner's argument is unpersuasive. An error is harmless only if the Court is convinced that the ALJ would reach the same result on remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Appropriately considering and weighing Dr. Schwartz's opinion regarding the self-care domain could significantly impact the ALJ's decision. Had the ALJ carefully considered Dr. Schwartz's opinion that S.K. was markedly limited, the ALJ may have increased the limitation in the self-care domain. The ALJ accepted Dr. Schwartz's opinion as to every other domain. Consistent with Dr. Schwartz's opinion, the ALJ found that S.K. was markedly limited in interacting and relating with others. (R. at 26). If the ALJ had found that S.K. was markedly limited in the self-care domain, the "functionally equals" criteria would be met because a child functionally equals the listing

and is disabled if he is markedly limited in two of the six functional domains. 20 C.F.R. § 416.926a(d). The ALJ's failure to address Dr. Schwartz's opinion that S.K. has marked limitations in the self-care domain of caring was therefore not harmless error and is grounds for remand.

The Commissioner also points to evidence consistent with a less than a marked limitation in self-care that the ALJ recited, including function reports reflecting that S.K. is able to address many self-care and hygiene tasks, Dr. Patel's treatment notes indicating that S.K. is able to feed himself, undress himself, and brush his teeth with help, and the hearing testimony that S.K. likes to go to the park and eat out. The Commissioner's position is unavailing because this evidence focuses solely on S.K.'s physical abilities. Like the Commissioner, the ALJ failed to give proper consideration to S.K.'s emotional state in the self-care domain. Caring for yourself involves more than physical abilities to perform hygiene tasks. It also requires consideration of emotional abilities including the ability to keep oneself safe. 20 C.F.R. § 416.926a(k)(1)(i).

> [T]he domain of "Caring for yourself" does not address children's physical abilities to perform self-care tasks like bathing, getting dressed, or cleaning their room. We address these physical abilities in the domain of "Moving about and manipulating objects" and, if appropriate, "Heath and physical well-being. . . . Rather, in "Caring for yourself," we focus on how well a child relates to self by maintaining a healthy emotional and physical state in ways that are age-appropriate and in comparison to other same-age children who do not have impairments.

Social Security Ruling (SSR)[3] 09-7p, at *2. SSR 09-7p further explains that "the ability to experience, use, and express emotion is often referred to as self-regulation. Children should demonstrate an increased capacity to self-regulation as they develop." *Id.* at *3.

The ALJ failed to discuss significant evidence of unsafe behaviors and an unhealthy emotional state. Ms. King testified that S.K. has a history of unsafe behaviors and needs constant supervision. For example, S.K. will run into the street if she is not holding his hand, he ran his head into the china cabinet, he tries to stick his fingers in electrical outlets, and he climbed on top of the refrigerator. (R. at 78, 91–92, 123). There is also evidence that S.K. struggles to maintain a healthy emotional state. Ms. King frequently get calls from S.K.'s preschool reporting that S.K. is short tempered, throws chairs, and will not listen. (*Id.* at 71–72). S.K.'s preschool has recommended special counseling for S.K. because of this disruptive behavior. (*Id.* at 73). In her decision, the ALJ also failed to acknowledge the specific findings of one of S.K.'s teachers, Ms. Schmidt, who found a very serious problem (the most severe rating) in all five of the activities of the caring for yourself domain involving emotional self-regulation, including handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, respond-

---

[3] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

ing appropriately to changes in own mood (e.g., calming self), and using appropriate coping skills to meet daily demands of school environment. (*Id.* at 529). Ms. Schmidt stated:

> S.K. displays a short temper with poor judgment. When [he] becomes angry he will scream, cry, and kick anyone (student or adult) who is in his reach. He has difficulty calming himself and interaction with others is impossible during this period of time. [S.K.] when angry becomes unsafe for himself and those around him. He will throw objects, kick and punch the person that is closest to him.

(*Id.*). Dr. Schwartz explained that S.K. "has difficulty calming himself; . . . when angry he becomes unsafe, that's the key word . . . unsafe for himself and those around him." (*Id.* at 150). The ALJ ignored this evidence, which is clearly relevant to whether S.K. maintains a healthy emotional state, gets his emotional wants and needs met in appropriate ways, and copes with stress and changes in his environment. 20 C.F.R. § 416.926a(k). The ALJ's failure to consider this evidence prevents a meaningful review of her analysis and fails to build a logical bridge between the evidence and his conclusion. *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("We have repeatedly held that an ALJ must provide a logical bridge between the evidence in the record and her conclusion."). On remand, the ALJ shall analyze how this unsafe behavior and emotional-state evidence relates to S.K.'s ability to care for himself.

While the ALJ did "note" that S.K.'s teacher "suggested that [he] has difficulty handling frustration and appropriately addressing his emotional needs," the ALJ failed to provide any analysis of how this evidence is consistent with the ALJ's finding of less than marked limitation in the self-care domain. (R. at 27). The ALJ of-

fered no explanation as to how the teacher's report of a "very serious problem" (the most severe rating) in S.K.'s ability to handle frustration appropriately, be patient, identify and appropriately assert emotional needs, respond appropriately to changes in own mood, and use appropriate coping skills to meet daily demands of school environment support her finding of less than marked limitation in the caring for yourself domain. An ALJ must minimally articulate her analysis of the evidence so the court can follow her reasoning. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The ALJ does not adequately explain how she concluded that S.K. has less than marked limitations in self-care despite his preschool teacher's report that S.K. has a "very serious problem" in all five of the activities of the caring for yourself domain. Because the ALJ did not connect the dots so the Court can follow her reasoning, her self-care finding requires remand for the ALJ to properly explain her decision. On remand, the ALJ must give reasons for finding that Ms. Schmidt's suggested limitations equate with the ALJ's finding of less than marked limitations or provide reasons for discounting Ms. Schmidt's opinion as a teacher.

S.K. argues that the ALJ improperly relied on his non-receipt of special education services and good behavior at consultative exams to find that S.K. was less than markedly limited in the self-care domain. Non-receipt of special education is relevant but is not in itself dispositive evidence of a child's functional abilities. 20 C.F.R. § 416.924a(b)(7)(iv) ("The fact that you do or do not receive special education services does not, in itself, establish your actual limitations or abilities."). The Commissioner is correct that the ALJ did not cite the lack of special education, in

itself, to establish S.K.'s actual limitations or abilities. (R. at 27). The ALJ stated, among other reasons for finding that S.K. has less than marked limitation in self-care, that "the record reflects that the claimant is not provided any special education or special accommodations in school." (*Id.*).

Nevertheless, S.K. argues, and the Commissioner does not dispute, that private preschools and day care programs are not obligated to provide special education services. (Dkt. 8 at 11–12). Thus, S.K. concludes it was not relevant that he was not in special education classes at his YMCA day care/preschool program. More importantly, the ALJ's evaluation of the evidence on this issue in incomplete with respect to Ms. King's testimony. The ALJ stated that S.K. was in regular classes and "the record reflects that [he] is not provided any special education or special accommodations in school and receives no treatment for any type of behavioral disorder." (R. at 24, 27). The ALJ ignored Ms. King's testimony that for two years, S.K. was not in a regular class but rather in a separate class because of learning disabilities and behavioral issues. (*Id.* at 71). The ALJ also failed to consider that the preschool implemented behavior modification strategies for S.K. (*Id.* at 527) (S.K.'s "teachers implement strategies for behavior modification using pictures related to appropriate behavior, book, and redirection."). The ALJ's failure to consider evidence indicating that S.K. was not in regular classes as the ALJ asserts, but rather is in a separate classroom for children with learning disabilities and behavioral issues "does not provide much assurance that [she] adequately considered [S.K.'s] case." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

S.K. also objects to the ALJ's consideration of his good behavior during consultative examinations in assessing his self-care functioning. S.K. argues that good behavior in unusual situations (like a consultative exam) is not evidence of a child's typical behavior in everyday settings including school and the home. Indeed, "[c]hildren may function differently in unfamiliar or one-on-one settings than they do in their usual settings at home, at school, in childcare or in the community . . . [and] may appear more or less impaired on a single examination (such as a consultative examination) than indicated by the information covering a longer period." 20 C.F.R. § 416.924a(b)(6). The ALJ is therefore required to consider "typical day-to-day functioning in routine situations" along with special situations and must "not draw inferences about . . . functioning in other situations based only on how [a child] function[s] in a one-on-one, new or unusual situation." *Id*.

Here, the ALJ noted that "it appears that when [Plaintiff] was called upon to appropriately assert his emotions, as reflected in his good behavior during his many consultative evaluations, [he] was able to do so." (R. at 27). The ALJ correctly did not rely solely on S.K.'s improved behavior during consultative examinations to establish his functioning. *Id*. Instead, she gave several reasons for finding S.K. had less than a marked limitation in the ability to care for himself. *Id*. However, as detailed above, the ALJ improperly disregarded highly probative emotional-state evidence relating to S.K.'s day-to-day functioning in his preschool setting and unsafe behaviors at home in assessing S.K.'s functioning in the domain of caring for himself. On remand, the ALJ should assess both types of evidence, S.K.'s typical day-to-

day functioning in routine situations along with functioning in atypical one-on-one, new, or unusual settings, keeping in mind that "it is a well-known clinical phenomenon that children with some impairments (for example, AD/HD) may be calmer, less inattentive, or less out-of-control in a novel or one-to-one setting, such as a CE." SSR 09-2p, at *12.

## B. Attending and Completing Tasks

In this domain, the ALJ considers the child's ability "to focus and maintain . . . attention," and how well he can "begin, carry through, and finish . . . activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). A preschooler should be able to pay attention when spoken to directly, sustain attention to playing and learning activities, and concentrate on activities like putting puzzles together or completing art projects. *Id.* § 416.926a(h)(2)(iii). A preschooler is expected to be able to focus long enough to do many more things by himself, such as getting clothes together and dressing himself, feeding himself, or putting away toys. *Id.* The preschooler should also be able to wait his turn and change his activity when a caregiver or teacher says it is time do to something else. *Id.*

In support of her conclusion that S.K. has had less than marked limitation in attending and completing tasks, the ALJ noted that S.K. "clearly has some problems with attention, concentration, and task completion." (R. at 26). The ALJ further noted, however, that S.K. has not received any treatment for ADHD. (*Id.*). The ALJ referenced the consultative examinations which indicate that S.K.'s focus and atten-

tion "is capable of being re-directed, although with some effort." (*Id.*). The ALJ also noted that a less than marked limitation in this domain was consistent with Dr. Schwartz's opinion. (*Id.*).

The ALJ did not provide adequate reasons for her finding that S.K.'s limitations were less than marked in the domain of attending and completing tasks. The ALJ discounted the severity of S.K.'s ADHD and his functional limitations based upon his lack of ADHD treatment. (R. at 26). Although lack of treatment can be one reason to question the severity of a claimant's impairments and functional limitations, the ALJ should also consider why the claimant did not seek treatment. *Lott v. Astrue*, 541 F. App'x 702, 706 (7th Cir. 2013). Ms. King testified that she had not scheduled regular counseling for S.K. because of her job, she thought she could handle S.K. and teach him herself, and she did not understand that she needed help. (R. at 74, 77–78). The ALJ improperly failed to account for these reasons before discounting the severity of S.K.'s ADHD. Additionally, although no medication was prescribed by S.K.'s pediatrician to specifically treat S.K.'s ADHD, Ms. King testified that S.K.'s pediatrician did prescribe medicine to "calm him down." (*Id.* at 75, 359).

The ALJ's second reason for finding that S.K. has had less than a marked limitation in the domain of attending and completing tasks is that S.K.'s focus and attention were capable of being re-directed with some effort during the consultative examinations. Again, this reason is flawed in isolation and without a consideration of S.K.'s typical day-to-day functioning in routine situations. 20 C.F.R.

§ 416.924a(b)(6) (requiring the ALJ to "look at your performance in a special situation and at your typical day-to-day functioning in routine situations").

In assessing S.K.'s abilities in the domain of attending and completing tasks, the ALJ improperly failed to address his preschool teacher's evaluation of his typical day-to-day functioning. "Common sense dictates that teachers and parents who observe a child's behavior may provide substantial evidence of a claimant's difficulties and limitations." *O'Neal v. Colvin*, 2016 WL 4150457, at *5 (N.D. Ill. Aug. 1, 2016); *see* 20 C.F.R. § 416.913(d); *see also Murphy v. Astrue*, 496 F.3d 630, 634–65 (7th Cir. 2007) (remanding where the ALJ gave no weight to the portions of school documents which supported a finding that the claimant had a marked limitation in attending and completing tasks). Nonmedical sources like teachers frequently "have close contact with individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." SSR 06-3p, at *3.

Ms. Schmidt found that S.K. has a very serious problem in waiting to take turns, a serious problem in paying attention when spoken to directly, and obvious problems in sustaining attention during play/sports activities, refocusing to task when necessary, carrying out multi-step instructions, completing class/homework assignments, completing work accurately without careless mistakes, and working without distracting self and others. (R. at 526). She concluded that S.K. has a short attention span, difficulty in a large group setting when a teacher is discussing a subject, becomes easily distracted, and acts inappropriately causing great disruption to the

classroom environment. (*Id*.). Because the issue before the ALJ was S.K.'s day-to-day functioning, the preschool teacher's opinion was important, and the ALJ was required to minimally explain what weight she assigned to it.

The ALJ's third reason for finding that S.K. has had less than a marked limitation in attending and completing tasks is also problematic. The ALJ noted that her finding was consistent with Dr. Schwartz's opinion. (R. at 26). But Dr. Schwartz inaccurately characterized the preschool teacher's responses. In his analysis of this domain, Dr. Schwartz stated that S.K.'s preschool teacher "gave him one five and one four" and "mostly the rest is twos and ones." (*Id*. at 154).[4] In fact, S.K.'s preschool teacher gave S.K. one five, one four, and six threes ("obvious" problem), which are more serious limitations than recognized by either Dr. Schwartz or the ALJ. Because Dr. Schwartz's finding that S.K. has had less than marked limitation in attending and completing tasks is based on his inaccurate description of the Teacher Questionnaire, neither Dr. Schwartz's opinion nor the ALJ's finding based on that opinion is supported by substantial evidence.

## C. Acquiring and Using Information

The domain of acquiring and using information refers to how well a child acquires or learns information and how well he uses the information he has learned. 20 C.F.R. § 416.926a(g). For preschool-age children (age three to six years), the child should begin to learn and use the skills that will help him to read and write and do

---

[4] The scale is from one to five, with five indicating "very serious" problem, four indicating "serious" problem, three indicating "obvious problem," two indicating "slight" problem, and one indicating no problem.

arithmetic, including, for example, listening to stories, rhyming words, matching letters, counting, sorting shapes, building with blocks, painting, coloring, copying shapes, and using scissors. *Id.* § 416.926a(g)((2)(iii). The child should be able to use words to ask questions, give answers, follow directions, describe things, explain what he means, and tell stories. *Id.*

S.K. contends that the ALJ's determination that he has had less than marked limitation in the domain of acquiring and using information is not supported by substantial evidence because S.K.'s full scale IQ score of 70 and 68 on global language abilities on the Wechsler Preschool IQ test are *per se* evidence of a marked limitation in this domain.[5] (R. at 456). These scores are two standard definitions from the mean score of 100. The regulations state that "[w]e will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean . . . and your day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii). S.K. also notes that his Preschool Language Scale score of 71 is a single point higher than two standard deviations below the mean of 100.[6] (R. at 473). However, the regulations also provide that "we will not rely on any test score alone. No single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(i). "[W]e may find that you do not have a 'marked' or 'extreme' limitation, even if your test scores are at the level pro-

---

[5] S.K.'s verbal IQ score was 74 and his performance IQ score was 73. (R. at 456).

[6] S.K. obtained an expressive language score of 80 (age equivalence of 2 years, 8 months) and an overall score of 73 (age equivalence of 2 years, 6 months) on the Preschool Language Scale-4 test. (R. at 473).

vided in paragraph (e)(2) or (e)(3) of this section, if other information in your case record shows that your functioning in day-to-day activities is not seriously or very seriously limited by your impairment(s)." *Id.* § 416.926a(e)(4)(ii)(B).

The ALJ recognized that "Dr. Friedson's testing of [S.K.] reflects that he has some cognitive delays." (R. at 26). However, she concluded that the limitations on S.K.'s abilities to acquire and use information that resulted from his impairments were less than marked based on Dr. Friedson's finding that S.K.'s test results indicated mild to borderline delays. (*Id.*). The ALJ also found that S.K. receives no special education instruction or other intervention. (*Id.*). The ALJ cited Dr. Schwartz's testimony that S.K. appears to be a "sharp little boy" and "street smart" suggesting that his hyperactivity may be affecting his cognitive ability. (*Id.*).

In finding that S.K. has a less than marked limitation in the domain of acquiring and using information, the ALJ did not adequately account for S.K.'s daily functioning or determine if it was consistent with his test scores. The regulations require that when an ALJ chooses not to rely on test scores at or below two standard deviations of the mean, she must "explain [the] reasons for doing so." 20 C.F.R. § 416.926a(e)(4)(iii)(B). The ALJ must also find that the child's daily functioning level is "not seriously limited or very seriously limited by [his] impairment(s)." *Id.* § 416.926a(e)(4)(ii)(B). The only day-to-day functioning example provided by the ALJ for finding that S.K. is not seriously or very seriously limited by his impairments is his lack of special education. (R. at 26). As noted above, the Commissioner does not dispute S.K.'s assertion that lack of special education services in a private

preschool is not relevant to the severity of the impairment given that private pre-schools are not obligated to provide special education services. The ALJ's statement that S.K. "attends regular classes" and "receives no special education instruction or other intervention" is also misleading. (*Id*. at 24, 26). The ALJ's statement ignores that S.K. was not in a regular preschool class but was in a separate preschool class-room because of learning disabilities and behavior issues. (*Id*. at 70–71). The ALJ cites no other evidence which suggests that S.K.'s functioning in day-to-day activi-ties is inconsistent with his low test scores.[7] The Court is therefore unable to de-termine whether substantial evidence supports the ALJ's opinion. On remand, the ALJ shall more fully discuss the evidence of S.K.'s day-to-day functioning in the domain of acquiring and using information and explain whether S.K.'s day-to-day functioning is consistent with his low test scores. If S.K.'s day-to-day activities pro-vide the ALJ with sufficient evidence to discount his test scores, that determination and the reasons for it must be specifically addressed on remand.

S.K. next argues the ALJ erred by relying on Dr. Schwartz's testimony that S.K.'s low test scores were attributable to his difficulty paying attention, rather than his cognitive potential. (R. at 136, 152–53). In addressing the acquiring and using information domain, Dr. Schwartz found that S.K.'s dated test results did not currently apply. (*Id*. at 152). Dr. Schwartz concluded that S.K. is "going to have

---

[7] Other evidence, not cited by the ALJ, indicates that S.K. does have trouble with the skills listed in the acquiring and using information domain. S.K.'s teachers noted that he has trouble following directions. (R. at 500). On October 15, 2007, Dr. Miller noted that S.K. "was able to copy a line but not a circle or a cross." (*Id*. at 462). On December 7, 2009, the speech and language evaluator noted that S.K. "was unable to identify colors, make infer-ences or identify categories of objects in pictures." (*Id*. at 473).

problems acquiring and learning because he can't pay attention." (*Id.* at 153). Dr. Schwartz opined, however, that S.K. was less than markedly limited in acquiring and using information because he seems to be a "pretty sharp little boy" with "street smarts." (*Id.*). The ALJ relied on Dr. Schwartz's statement that S.K.'s "hyperactivity may be affecting his cognitive ability." (*Id.* at 26).

The ALJ's reliance on Dr. Schwartz's view that S.K.'s limitations are behavioral rather than cognitive is legally irrelevant. It does not matter whether a child is limited in acquiring and using information because of his inattention or because of a cognitive shortcoming. The ALJ was required to assess S.K.'s functional limitations in the domain of acquiring and using information caused by his ADHD. 20 C.F.R. § 416.926a(a) ("We will assess the functional limitations *caused by your impairments(s).*") (emphasis added); SSR 09-1p, at *3 ("Adjudicators must consider the particular effects of a child's impairment(s) on the child's activities in any and all of the domains that the child uses to those activities."). S.K.'s attention problems are relevant in evaluating the domain of acquiring and using information. The fact that S.K.'s ADHD impacts his ability to acquire and use information should have been considered by the ALJ and cannot be isolated from S.K.'s cognitive ability. On remand, both S.K.'s cognitive ability and the effects of S.K.'s ADHD must be considered. The ALJ shall not discount limitations in S.K.'s ability to acquire and use information merely because such limitations arise from his ADHD and not his cognitive ability.

Also troubling is the ALJ's failure to mention, let alone discuss, the state agency psychological consultant's opinion that S.K. was markedly limited in acquiring and using information. (R. at 477). The ALJ stated only that she gave "little weight to no weight to the State Agency opinions because of the numerous incongruities in the agency's findings." (*Id.* at 26). While inconsistencies in the state agency consultants' findings may be a good reason for giving little to no weight to their opinions, the ALJ did not adequately articulate her reasoning for discounting their opinions. In particular, the ALJ did not point to any perceived inconsistencies in the state agency consultants' findings. *Moon*, 763 F.3d at 721 ("The ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination."); *Steele*, 290 F.3d at 940 (Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."). The ALJ must consider *all* relevant evidence and may not selectively analyze only that information supporting the ALJ's ultimate conclusion. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000); *see also* 20 C.F.R. § 416.927(e)(2) (stating ALJs must consider opinions made by state agency medical or psychological consultants and explain the weight given to the opinions of the consultants). While an ALJ need not articulate her reason for rejecting every piece of evidence, she must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position. *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ's failure to minimally discuss the state agency psychological consultant's opinion that S.K. is markedly limited in acquiring and using information does not meet

the level of articulation required. On remand, the ALJ should consider the state agency psychological consultant's opinion that S.K. is markedly limited in acquiring and using information and minimally articulate her analysis of such evidence and the weight given to it.

## VI. CONCLUSION

Because the Court is remanding on the functional equivalence issue, the Court chooses not to address S.K.'s argument that the ALJ erred by failing to find that his impairments meet or medically equal Listing 112.02. For the reasons stated above, Defendant's Motion for Summary Judgment [15] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.


E N T E R:

Dated: October 17, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge